UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

MARK SCHINNERER,

                          Petitioner,

    v.                                                                    9:23-CV-0372
                                                                              (ECC)
D. BRADFORD,

                          Respondent.

---

APPEARANCES:                                          OF COUNSEL:

MARK SCHINNERER
Petitioner Pro Se
19-A-0809
Mohawk Correctional Facility
P.O. Box 8451
Rome, New York 13440

HON. LETITIA JAMES                                    PRISCILLA I. STEWARD, ESQ.
Attorney for Respondent                               Ass't Attorney General
New York State Attorney General
The Capitol
Albany, New York 12224

ELIZABETH C. COOMBE
United States District Judge

## DECISION and ORDER

## I.    INTRODUCTION

Petitioner Mark Schinnerer seeks federal habeas relief pursuant to 28 U.S.C. § 2254.

Dkt. No. 1, Petition ("Pet.").[1]  Respondent opposed the Petition.  Dkt. No. 7, Response; Dkt.

No. 7-1, Memorandum of Law in Support; Dkt. No. 17, Sealed State Court Records.

---

[1]   For the sake of clarity, with limited exceptions, citations refer to the pagination generated by CM/ECF, the Court's electronic filing system, but citations to the sealed State Court Record ("SCR"), Dkt. No. 17-3 , sealed State Court Sentencing ("S."), Trial ("T."), and 440 Hearing ("H.") transcripts, Dkt. Nos. 17 to 17-2, refer to the Bates stamp at the bottom-center of each page and the upper right-hand corner, respectively, as each exhibit is separately and consecutively paginated.

Petitioner filed a reply.  Dkt. No. 14, Reply.  Petitioner also moves to expand the state court record.  Dkt. No. 16.  That motion is fully briefed.  Dkt. Nos. 18, 19, 20.

Petitioner filed a writ of mandamus with the United States Court of Appeals, Second Circuit.  Dkt. No. 23.  On August 12, 2025, the Second Circuit denied the petition without prejudice for refiling if this Court fails to take action on the petition within sixty (60) days.  Dkt. No. 28.  On October 3, 2025, this case was reassigned to the undersigned.

For the following reasons, the Petition is denied and dismissed.  Additionally, petitioner's motion to expand the record is also denied.

## II.    RELEVANT BACKGROUND

### A.    State Court Criminal Proceedings

#### 1.    The Indictment

A Schoharie County grand jury charged petitioner in an eight-count indictment.  SCR at 50-52.  Three counts related to conduct which allegedly occurred "on or about April 1, 2017-April 30, 2017[:]" (1) Count One – Rape in the First Degree; (2) Count Three – Rape in the Third Degree; and (3) Count Five – Endangering the Welfare of a Child.  SCR at 50-51.  Three counts related to conduct which allegedly occurred "on or about September 13-October 13, 2017[:]" (1) Count Two – Rape in the First Degree; (2) Count Four – Rape in the Third Degree; and (3) Count Seven – Endangering the Welfare of a Child.  SCR at 50-52.  The final two counts related to conduct which allegedly occurred in February of 2017: (1) Count Five – Criminal Sexual Act in the Third Degree; and (2) Count Eight – Endangering the Welfare of a Child.  SCR at 51-52.

Before trial, petitioner's counsel moved to dismiss Counts Five and Eight from the indictment because the evidence presented to the grand jury was not legally sufficient to

support those counts.  T. 260-62.  The prosecutor agreed, and the trial court dismissed both counts.  T. 262-63.

### 2. The Trial

Petitioner's criminal trial was held in Schoharie County Court before County Court Judge George R. Bartlett, III.  T. 1, 175, 380, 515, 646.

### i. The Prosecution's Case

The following facts are based on the testimony offered by the prosecution.  The victim was born in 2001, and, at the time of petitioner's criminal investigation, was 16 years old.  T. 309.  Petitioner was 54 years old.  T.418.

In June of 2012, the victim and her mother moved in with petitioner on his farm, and in August 2013, petitioner married the victim's mother.[2]  T. 309-310, 386, 482.  The three of them lived together on the farm in West Fulton, New York, until October of 2017, when the victim informed a school guidance counselor that petitioner was sexually abusing her.  T. 309, 394.

The victim testified that their relationship began normally enough, but "then after a few months to a year later, it got weird."  T. 310.  Specifically, the victim stated that, after falling asleep in a barn that was on the property, she awoke to find petitioner's hands down her pants, under her clothes, touching her vaginal area.  T. 310.  The victim stated that this behavior continued, multiple times a week, while her mother was at work and the victim was home alone with petitioner.[3]  T. 311.

---

[2]  The victim's mother testified that the victim's biological father died when he was young, after a prolonged illness, which left the victim with an attachment disorder that causes the victim not to express her emotions or share her feelings with anyone.  T. 389-90.

[3]  The victim arrived home from school around 3/3:15 P.M. and her mother arrived home between 5:30-6:00 PM.  T. 311

The victim indicated that she asked petitioner to stop, and he explained to her "that it was a learning experience." T. 311. The victim did not tell anyone what was happening. T. 312. After the victim asked petitioner to stop, she testified that the abuse worsened and escalated to petitioner performing oral sex on the victim. T. 312.[4]

The victim also testified that petitioner purchased underwear sets from Amazon for the victim to wear for him. T. 318-19. The victim explained that petitioner told her that her mom "probably wouldn't like it if she knew that [petitioner] had bought those [underwear sets] for [the victim],' so she should hide them. T. 319.

The victim was then directed to recall a specific incident during April break of 2017, when the victim claimed the first rape occurred ("April rape"). T. 312-13. The victim explained that she was washing dishes in the kitchen when petitioner approached her from behind, picked her up, and carried her to the bedroom. T. 313. Petitioner proceeded to pull down both his and the victim's pants, hold the victim down (by placing his body on top of hers), and insert his penis into her vagina. T. 313-14. The victim said she "screamed and . . . said stop," however, petitioner did not stop. T. 314. The victim never told anyone about this incident. T. 314.

The victim's attention was then directed to the period between mid-September and mid-October, when the victim stated she was raped for the second time ("September/October rape"). T. 314. The victim stated that petitioner again picked her up, brought her into the bedroom, placed her on the bed, removed their pants, and inserted his penis into her vagina. T. 315-17. The victim testified that she could not remember the exact day that the rape

---

[4] Before trial, the court conducted a *Molineaux* hearing and granted, in part, the People's motion to admit evidence of petitioner's uncharged crimes, including evidence that petitioner repeatedly touched the victim's vagina, performed oral sex on her, ignored her request to stop sexually assaulting her, and purchased special underwear for her that petitioner asked her to wear for him. T. 263-282.

happened, and her best guess was sometime during the ten to fourteen days before she reported the rape to her school counselor on October 13, 2017.  T. 317.

On cross-examination, the victim repeatedly testified that she could not remember the specific date of the September/October rape, or the details immediately preceding it.  T. 322-24.  However, she did recall that the September/October rape occurred in the afternoon, after she arrived home from school, and probably while she was finishing up her daily chores.  T. 325-27.  The victim stated that petitioner did not threaten her with bodily harm or injury during the attacks.  T. 364.

At the conclusion of the victim's testimony, the trial judge read the following jury instruction based on the *Molineaux* issues:

> There is evidence in this case that on other occasions, [petitioner] engaged in criminal conduct for which he is not on trial in this case.  That evidence was not offered and must not be considered for the purpose of proving that the [petitioner] had a propensity or predisposition to commit the crimes charged in this case.
>
> It was offered as evidence for your consideration as background evidence just of the nature of the relationship between the [petitioner] and the victim and to provide you context for the charged conduct.  If you find the evidence believable, you may consider it for that limited purpose and for none other.

T. 382.

The prosecution called witnesses to testify about the events that occurred after the victim's disclosure.  The victim's mother and the police were notified immediately.  T. 395.  The victim was interviewed by Terri Borst, a caseworker for the Child at Risk Response Team ("CARRT"), and Investigator Bruce Baker, with the Criminal Investigation Unit of the Schoharie County Sheriff's Office.  T. 323-24, 362-63.

The prosecution also called Sura Page, a licensed clinical social worker specializing in working with sexual assault and child abuse victims, about "how victims of child sexual abuse

may respond or may behave as it pertains to the child sexual abuse accommodation syndrome." T. 426. Page explained that there are five elements commonly seen in cases where a trusted adult becomes a predator to a known child victim, ultimately grooming them for sexual abuse. T. 426-27. Page emphasized that these reactions and responses from child sex abuse victims are often counterintuitive to what the public's assumptions would be. T. 427-28.

The first element is secrecy, where the abuse occurs in private places and the adult uses, among other things, gifts, bribes, or threats that something bad will happen to keep the abuse secret. T. 428-29. The second element is a feeling of powerlessness or helplessness in the victim. T. 432. Specifically, the adult abuser has all the physical and social power and any fleeting attempts to initially stop the abuse and stand up to this power are often futile. T. 432-34. The third element is having the victim develop accommodating behaviors to try and cope with the burden of the secrecy and the helplessness and powerlessness. T. 434. This may look like the victim blaming themselves, becoming a rebel or a perfectionist, or dissociating/zoning out during the periods of abuse. T. 435-36. While dissociation can be an effective coping mechanism, Page explains that it leaves the victim unable to recall specific details of the trauma that they were trying to avoid. T. 435, 440. The fourth element is often an inconsistent disclosure, where the amount of information and the detail provided varies depending upon the reactions of the person who the victim decides to confide in. T. 437-39. The final element is recanting or retraction. T. 440. Because disclosure is "a process", T. 439, Page explains that a victim may take back some or all of their story depending on what happens following their disclosure, T. 441. Page concluded by stating that a child victim may

have some, all, or none of these elements; however, they tend to be the most common things observed among child victims who were abused by trusted adults.  T. 442-43.

### ii.    The Defense Case

During the defense case, petitioner testified on his own behalf, and called his wife – the victim's mother – and Rachel McCann – a family specialist working with a foster care agency.

Petitioner denied all allegations of inappropriate sexual contact with the victim and stated that he had never assaulted her in any way.  T. 488.  Petitioner also denied that he ever purchased the victim any underwear, instead describing the interaction as one where the victim indicated that her underwear needed replacing and petitioner provided the victim with his credit card, which she took upstairs.  He explained that he never knew or saw what specifically she purchased and only knew the final cost of the transaction and that the package was delivered to the home and presumably opened and used by the victim.  T. 499-500.

Petitioner testified that he would only intervene in disciplining and parenting when the victim and her mother got into heated battles, usually about the victim not doing her chores.  T. 489-90.  Petitioner indicated that, immediately before the victim's disclosure to the guidance counselor at school, he and the victim had a disagreement about whether the victim should be permitted to use her mother's car.  T. 492-94.  Petitioner contends that the victim threatened him, saying that petitioner should not prohibit her from using the car or else "[she]'ll get even."  T. 492.

On October 13, 2017, petitioner received a call from the police asking if he would come to the police station for a discussion.  T. 496.  Petitioner agreed, and, while he was en

route, called his former attorney from a matrimonial matter to "ask[] her what [petitioner's] rights were so when [he] go[t] down to the police station," he would have a better ideal of what he should do.  T. 498-99.  Petitioner testified that he was arrested that night.  T. 499.

The defense also called Rachel McCann, who knew petitioner and his wife as former foster parents for the agency with which she worked.  T.526.  McCann testified that, during the week of April break in 2017, she placed two foster children at petitioner's home for respite care while their foster parents were on vacation.  T. 527-30; *see also* T. 470-72, 486-87. Given the additional foster children in the home that week, the victim's mother testified that she worked a reduced schedule, taking several days off and shifting her work hours for the remainder of the week.  T. 470-72.

### iii.    The Jury Charge, Deliberations, and Verdict

The jury charge repeated the limiting instruction about the use of testimony regarding uncharged bad acts.  T. 607.  Further, the jury charge defined the elements of all the pending criminal charges.  Specifically, the charge defined forcible compulsion as follows: "Forcible compulsion means to intentionally compel by the use of physical force."  T. 616.

The jury asked several questions during its deliberation.  The first was a request to read back part of the victim's testimony.  T. 631-33.  The second was to repeat the definition of endangering the welfare of a child.  T. 636.  The third was to ask to cease deliberating for the night and return the next day.  T. 640.  The fourth asked the court to repeat the definition for forcible compulsion.  T. 648.  The last announced that a verdict had been reached.  T. 649.

The jury acquitted petitioner of Counts One and Three, the first- and third-degree rape charges for the April rape.  T. 650-51.  However, the jury convicted petitioner of endangering

the welfare of a child for that April time period and also convicted him of Counts Two, Four and Seven in connection with the September/October time period.  T. 650-51.

### iv.    Motion to Set Aside Verdict and Sentence

On October 30, 2018, petitioner filed a counseled motion to set aside the verdict pursuant to New York Criminal Procedure Law § 330.30.  SCR at 132-139.  Specifically, petitioner sought to set aside his guilty verdict on Count Two, the first-degree rape charge associated with the September/October rape.  SCR at 134, 138.  Petitioner argued that "there was no testimony from the victim that the [petitioner] used any physical force to compel her to submit to sexual intercourse."  SCR at 138.  Although the victim indicated that petitioner picked her up, she also clarified "that she suffered no physical harm from the [petitioner's] action[ n]or did . . . she fe[el] compelled to submit to sexual intercourse by [him] picking her up and carrying her into the bedroom."  Id.  In sum, there was no physical proof of forcible compulsion to support a conviction.  SCR at 138-39.  The People opposed the motion.  SCR at 140-41.

On January 29, 2019, the trial judge denied petitioner's motion. SCR at 140-44.  The court found that:

> The alleged victim was 16 years old and the [petitioner] was her stepfather.  The victim testified to a lengthy history of sexual abuse perpetuated on her by [petitioner], primarily when she and the [petitioner] were the only ones home.  With this as background, on the date in question the victim testified that [petitioner] . . . scooped her up from behind, carried her into the bedroom, placed her on the bed, removed her clothing, and then penetrated her vagina with his penis.
>
> Viewing the totality of this evidence, in the light most favorable to the People, the Court concludes there is legally sufficient evidence.

> The evidence presented here of physical force by no means is
> overwhelming and creates a difficult issue, but a review of the
> totality of the evidence in the light most favorable to the People
> leads us to a conclusion that the evidence presented sets forth
> sufficient proof to support the jury verdict.

SCR at 143.

On February 11, 2019, petitioner filed a second, counseled motion for dismissal of his

indictment pursuant to New York Criminal Procedure Law §§ 330.30, 210.20(c) & 210.35(5).

SCR at 146-152.  Petitioner's counsel argued that the grand jury proceedings were defective,

as evidenced by an indictment which contained two charges which were ultimately denied

immediately before the commencement of proof in petitioner's criminal trial.  SCR at 149-52.

The People opposed the motion.  SCR at 155.

On February 20, 2019, petitioner's motion was denied.  SCR 153-160.  Specifically,

the trial court found that while Counts 5 and 8 should have been dismissed when deciding

pretrial motions, "the Grand Jury proceedings were [not] so impaired as to present 'an actual

likelihood' of prejudice, to warrant dismissal of the entire indictment."  T. 159.  Further, the

two counts were ultimately dismissed prior to petitioner's criminal trial; therefore, petitioner

was "unable to demonstrate how any error affected the remaining counts of the indictment . .

. and [petitioner] was found guilty after a trial of some of the Counts."  T. 159.

On February 20, 2019, petitioner was sentenced to concurrent, determinate prison

terms of 8 years of custody, plus 20 years of post-release supervision on the first-degree

rape count; 3 years of custody, plus 10 years of post-release supervision on the third-degree

rape count; and one year of custody for each count of endangering the welfare of a child.  S.

7-8.

**B.**      **The Direct Appeal**

10

Petitioner filed a counseled brief and appendix in the New York State Appellate Division, Third Department, arguing that he was entitled to relief because (1) his conviction for first degree rape was not supported by legally sufficient evidence of forcible compulsion; (2) the trial judge abused his discretion when he allowed the prosecution to introduce evidence of uncharged bad acts, resulting in an unfair trial; (3) the prosecution violated the trial court's *Molineaux* ruling, which denied petitioner a fair trial; and (4) the trial court abused its discretion in denying petitioner's motion for dismissal of the indictment based upon defects which occurred in the grand jury proceedings.  SCR at 1-163.[5]

On March 25, 2021, the Third Department affirmed the conviction.  *People v. Schinnerer*, 192 A.D.3d 1395 (3rd Dep't 2021).[6]  With respect to petitioner's first claim, the Appellate Division found that the forcible compulsion element was satisfied by the victim's testimony that:

> in April 2017, she was 16 years old and that, during her school break that month, she was in the kitchen when defendant, a relative, picked her up and brought her into his bedroom. The victim testified that defendant held her on the bed, pulled down her pants and inserted his penis into her vagina. She explained that defendant "had his weight on top of [her] so he was holding [her] down." The victim testified that she screamed and told defendant to stop, but he did not.

*Id*. at 1396.

The Third Department also rejected petitioner's claims about the improperness or resulting unfairness of the trial court's *Molineaux* ruling.  *Schinnerer*, 192 A.D.3d at 1396. The Third Department concluded that the testimony which showed how petitioner groomed the victim "constituted necessary background information [and] . . . demonstrated the

---

[5]  Petitioner was represented by the same attorney at trial and on appeal.
[6]  A copy of the Third Department's decision is in the State Court Record.  SCR at 206-09.

escalating nature of the sexual abuse and revealed the manipulative and abusive setting in which the victim lived[.]" *Id.* Further, the trial court properly delivered a limiting instruction, to which petitioner consented. *Id.* Finally, the Third Department concluded that his *Molineaux* argument was "unpreserved for [the Appellate Division's] review as [petitioner] failed to object to this testimony." *Id.* at 1396-97.

Next, the Appellate Division concluded that "the grand jury minutes do[] not reveal any errors in presenting the case to the grand jury that impaired the integrity of the proceedings or caused prejudice to [petitioner] so as to warrant the drastic remedy of reversal." *Schinnerer*, 192 A.D.3d at 1397. Finally, the Third Department generally found any remaining claims to be meritless. *Id.*

Petitioner filed a counseled application for leave to appeal to the New York Court of Appeals, asking that the Court of Appeals only review his legal sufficiency claim. SCR at 210-11. On June 21, 2021, the Court of Appeals denied petitioner's application. *People v. Schinnerer*, 37 N.Y.3d 968 (2021).

### C. Collateral Challenges

#### 1. Coram Nobis Motion

On approximately July 26, 2021, petitioner filed a pro se motion for a writ of error coram nobis. SCR at 213-234. Petitioner argued that he was entitled to relief because (1) his appellate counsel's assistance "was so nominal it amounted to the substantial equivalent of having no counsel at all;" and (2) even if said assistance was deemed more substantial, it "still did not reach a level of performance sufficient to satisfy an objective standard of reasonableness, and there is a 'reasonable probability' that but for counsel's deficient performance, the outcome . . . would have been different." SCR at 214. Specifically,

petitioner contends that his appellate counsel was ineffective by (1) failing to cite to Supreme Court precedent to support his legal insufficiency claim on direct appeal, SCR at 221-222; (2) failing to file a reply brief to the People's opposition, SCR at 222; and (3) failing to argue that petitioner's sentence was harsh and excessive, SCR at 222.  The People opposed the motion, SCR at 240-49, and petitioner filed a pro se reply, SCR at 250-56.

On December 23, 2021, the Third Department summarily denied the motion.  SCR at 257.  Petitioner filed an application for leave to appeal, SCR at 258-264, which the Court of Appeals denied on March 31, 2022, *People v. Schinner*, 38 N.Y.3d 954 (2022).[7]

### 2.    Motion to Vacate the Judgment of Conviction

On approximately July 11, 2022, petitioner filed a pro se motion to vacate his judgment in Schoharie County Court pursuant to New York Criminal Procedure Law § 440.10.  SCR at 266-290.  Petitioner argued that both the prosecutor committed misconduct, in concealing the actual date of the alleged rape, and that his trial counsel was ineffective, for failing to discover the actual date of the alleged rape, which resulted in petitioner's inability to pursue an alibi defense.  SCR at 276-286.  The People opposed the motion, SCR at 291-99, and petitioner filed a pro se reply, SCR at 316-320.

Petitioner was then appointed counsel, who filed supplemental briefing on the alibi issue.  SCR at 321-328.  The People again opposed petitioner's contentions.  SCR at 329-334.

On November 2, 2022, Schoharie County Supreme Court Justice Peter A. Lynch conducted a hearing on petitioner's motion.  *See* Dkt. No. 17-1.

### i.    Petitioner's Case

---

[7]  A copy of the Court of Appeals decision is in the State Court Record.  SCR at 257.

Petitioner called Attorney Mark J. Gaylord and testified on his own behalf during the hearing.

Gaylord testified that he was appointed by the court to represent petitioner throughout his state court criminal trial process, from indictment to sentencing, and then was retained by petitioner to serve as his appellate attorney. H.8-9. Gaylord also represented petitioner in a parallel family court proceeding that was being litigated simultaneously with his criminal one. H. 37. Gaylord estimated that he probably had at least a hundred conversations with petitioner about his pending criminal and family court matters, reporting that he met with petitioner "at least 10 or 15 times in person" and spoke with him often on the phone. H. 37-38.

Gaylord denied having knowledge of the exact date which gave rise to the September/October rape and additional September/October charges. T. 23, 55. Instead, Gaylord testified that he attempted to narrow the date range by serving a demand for a bill of particulars, asking the prosecution to provide a specific date, time, and location of the offense. H. 11, 28. However, the Bill of Particulars repeated the date range of mid-September through mid-October with no further clarification on when the crimes allegedly occurred. H. 13-15. Further, Gaylord explained that during the trial, he implemented a strategy to narrow the date range which included cross-examining the victim and individuals who took statements from her about how they attempted to get an exact date of the assault(s) from the victim and suggesting that the victim's vague testimony that she could not remember the date she was raped was incredible. H. 18-19, 29, 35-36.

At least as it pertained to the September/October rape, Gaylord's efforts were unsuccessful, which made it difficult because he had to defend against a range of dates for

which petitioner never indicated that he had an alibi defense.  H. 40-42, 51.  Consequently, Gaylord explained that there was never an investigation to pursue because "there was no alibi witness to track down."  H. 44-45.

Gaylord did, however, investigate petitioner's claims that he and his wife had been fostering two children, as respite caregivers, during the time of the alleged April rape.  H. 21-22.  Gaylord called a witness from the foster care agency to confirm the respite care and then argued that the victim's account of the April rape could not be credible because she failed to "explain[] the presence of these two other children in the house."  H. 23.

Additionally, Gaylord testified that he first came into possession of the grand jury minutes on the day of, or the days immediately preceding, the trial, and that he had always had a policy that anything that was in his file was able to be accessed by his client.  H. 16.

Petitioner testified that he and Gaylord have met in person "about a dozen times; two w[ere] outside of the courthouse and the rest were in the courthouse where [Gaylord] discussed the procedures of what was going on and how everything was going."  H. 62.  Petitioner also testified that he spoke to Gaylord on the phone "not even three times" for short conversations that were ten minutes or less in duration.  H. 63.  Petitioner testified that Gaylord visited him once at his home, for less than an hour, to see the layout of the rooms and discuss the upcoming trial.  H. 71.  Petitioner contends that Gaylord never had any legal visits or placed any legal calls to petitioner while he was in custody.  H. 78.  Further, petitioner claims that Gaylord never did any witness preparation with him prior to the trial.  H. 80.

Petitioner claimed that he would write to Gaylord, requesting various documents, and that petitioner never saw, let alone was provided, any of the requested paperwork until he

filed an Article 78 proceeding years after his criminal trial.  H. 63-65, 77.  Specifically, petitioner claimed that he never saw the Bill of Particulars or any discovery material.  H. 70. Petitioner admitted that Gaylord did discuss the allegations and the charges with him, H. 68, as well as "c[o]me up with a solution [during the alleged April rape] that the foster kids were there," H. 73-74.  Further, petitioner chose to retain Gaylord for his appeal, and Gaylord filed two 330 motions before the direct appeal's conclusion.  H. 80.  However, petitioner contends that Gaylord only informed him about what would be included in the direct appeal, without ever consulting with him.  H. 78.

Petitioner expressed frustration about the time period provided for the September/October rape, contending that it was really a two-week period of time in which petitioner and Gaylord could have found an alibi.  H. 74-76.  In fact, petitioner purported that his wife "would know . . . where [he] was at all times and where the [victim] was at all times, too," H. 74, and that there was one weekend, from Friday, September 29th through Sunday, October 1st, when the victim was at her grandmother's house in Berne that could have served as an alibi defense, H. 75.

### ii.    The People's Case

The People did not call any witnesses.  H. 83.

### iii.    The Court's Decision

In a written decision, dated November 3, 2022, the county court denied petitioner's 440 motion.  SCR at 336-343.  The court "credit[ed] the testimony of attorney Gaylord as wholly credible," and noted that the "claim that attorney Gaylord was wholly unresponsive throughout the defense process [wa]s inherently [incompatible] with [petitioner's] election to retain [Gaylord] to perfect the appeal."  SCR at 340.  Further, the court found that petitioner's

claims that "he was entirely unaware of the alleged dates of the offenses charged [wa]s not credible."  *Id.*  The court noted that the date ranges were in the indictment and that the victim's October 13 report never identified a specific date.  *Id.*

The court acknowledged Gaylord's attempts to narrow down a more precise date for the alleged assaults, by filing a demand for a bill of particulars; however, the efforts were fruitless because the prosecution responded with the identical date range in the indictment. SCR at 342.  Consequently, Gaylord "adopted a trial strategy to challenge the victim's credibility due to her inability to specify any specific date that the claimed offenses took place," which, the court concluded "was reasonable . . . [and] successful in obtaining acquittals of Counts 1 and 3."  SCR at 343.

Petitioner filed a pro se application for leave to appeal, SCR at 344-362, which was denied by the Third Department on February 9, 2023, SCR at 363.

## III.    PRESENT PETITION

Petitioner argues that he is entitled to federal habeas relief because (1) "the evidence was legally insufficient [to establish] . . . forcible compulsion," Pet. at 5-7; (2) petitioner was deprived of a fair trial when (a) "the trial judge abused his discretion by allowing the People to introduce, without restriction, an excessive amount of prejudicial bad act evidence[,]" *id.* at 7, 18, and (b) the prosecution violated the trial court's *Molineaux* ruling, *id.* at 8, 19; (3) the indictment should be dismissed because the trial court abused its discretion in denying petitioner's motion to dismiss based on defects in the grand jury proceedings, *id.* at 10, 20; (4) both petitioner's trial and appellate counsels were constitutionally ineffective, *id.* at 11, 21, 23; and (5) petitioner's Fourteenth Amendment rights were violated by prosecutorial misconduct, *id.* at 11, 22.

Respondent opposes the Petition, arguing that (1) even without the AEDPA's deferential standard of review, petitioner's legal sufficiency claim is meritless, Dkt. No. 7-1 at 23-29; (2) petitioner's challenge to his grand jury proceedings is not cognizable, *id.* at 30-31; (3) petitioner's claim that the People exceeded the scope of the trial court's evidentiary ruling is procedurally barred and meritless, *id.* at 31-38; (4) the state courts reasonably denied petitioner's claims of ineffective assistance of trial and appellate counsel, *id.* at 38-42, 44-48; and (5) the county court reasonably denied petitioner's claims of prosecutorial misconduct, *id.* at 42-44.

Petitioner filed a reply, which argued the merits of his claims.  Dkt. No. 14, Reply.

## IV.    DISCUSSION

### A.    Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant habeas corpus relief with respect to a claim adjudicated on the merits in state court only if, based upon the record before the state court, the state court's decision: (1) was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  28 U.S.C. §§ 2254(d)(1), (2); *Cullen v. Pinholster*, 563 U.S. 170, 180-81, 185 (2011); *Premo v. Moore*, 562 U.S. 115, 120-21 (2011); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).  This standard is "highly deferential" and "demands that state-court decisions be given the benefit of the doubt."  *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (per curiam) (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted)).

An "unreasonable application of" clearly established federal law occurs when the state court "correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case." *White v. Woodall*, 572 U.S. 415, 426 (2014). Such holdings must be "'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." *Id.* at 419 (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003)); *see also Nevada v. Jackson*, 569 U.S. 505, 508-509 (2013) (per curiam) ("[A] federal habeas court may overturn a state court's application of federal law only if it is so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with th[e Supreme] Court's precedents.'") (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)).

"Under the 'unreasonable determination of the facts' clause, § 2254(d)(2), a federal court will 'presume the correctness of state courts' factual findings unless [petitioner] rebut[s] this presumption with clear and convincing evidence.'" *Laboriel v. Lee*, No. 21-338-PR, 2022 WL 4479527, at *2 (2d Cir. 2022) (quoting *Schriro*, 550 U.S. at 473-74 (quoting 28 U.S.C. § 2254(e)(1))). "A state court decision is based on a clearly erroneous factual determination if the state court failed to weigh all of the relevant evidence before making its factual findings." *Lewis v. Connecticut Commissioner of Correction*, 790 F.3d 109, 121 (2d Cir. 2015) (internal quotation marks and citations omitted). In sum, the AEDPA foreclosed "'using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.'" *Parker v. Matthews*, 567 U.S. 37 (2012) (per curiam) (quoting *Renico,* 559 U.S. at 779). A state court's findings are not unreasonable under § 2254(d)(2) simply because a federal habeas court reviewing the claim in the first instance would have reached a different conclusion. *Wood v. Allen*, 558 U.S. 290, 301 (2010); *see also Schriro*, 550 U.S. at 473 ("The question under AEDPA is not whether a federal court believes the state court's

determination was incorrect but whether that determination was unreasonable - a substantially higher threshold.").

**B.    Legal Sufficiency**

Petitioner seeks federal habeas relief because the evidence supporting a finding of forcible compulsion for his rape conviction was legally insufficient.  Pet. at 5.

Respondent admits that the Appellate Division used the facts regarding the April rape to support its decision to affirm petitioner's conviction on the September/October rape, and concede that AEDPA's deferential standard should not be applied to that decision.  Dkt. No. 7-1 at 23-24.  Respondent nevertheless argues that the petition should be denied because, applying *de novo* review, petitioner has not established that the evidence was legally insufficient on the issue of forcible compulsion.  *Id.* at 24-29.

Petitioner disagrees with respondent's conclusion that the case can be reviewed *de novo* and, argues that even if it is, there is not sufficient evidence to support forcible compulsion.  Reply at 7-11.  Specifically, petitioner argues that because "[t]he victim does not state that petitioner held her down," and provides no other "testimony or . . . proof regarding forcible compulsion," the element has not been established.  *Id.* at 7-8.  Petitioner further contends that the lack of legal sufficiency is further demonstrated by the "Appellate division judges [intentional and volitional decision to use the wrong facts because] they had before them testimony which . . . was legally insufficient [for] . . . the [September/October rape and] . . . manipulated the testimony[.]"  *Id.* at 9.

**1.    AEDPA Deference**

The Second Circuit has explained that a

> state court's finding might represent an "unreasonable
> determination of the facts" where, for example, reasonable minds

could not disagree that the trial court misapprehended or misstated material aspects of the record in making its finding, *see Wiggins v. Smith,* 539 U.S. 510, 528 . . . (2003), or where the court ignored highly probative and material evidence, *see Miller–El v. Cockrell,* 537 U.S. 322, 346. . . (2003).

Of course, AEDPA "sets forth a precondition to the grant of habeas relief . . . , not an entitlement to it," *Fry v. Pliler,* 551 U.S. 112, 119 . . . (2007), **so even if the standard set forth in section 2254(d)(2) is met, the petitioner still "bears the ultimate burden of proving by a preponderance of the evidence that his constitutional rights have been violated,"** *Epps v. Poole,* 687 F.3d 46, 50 (2d Cir.2012).

*Cardoza v. Rock*, 731 F.3d 169, 178 (2d Cir. 2013) (emphasis added).

Here, it is clear that the Appellate Division supported its decision to affirm petitioner's conviction with the wrong facts.  As respondent explained,

[t]he [Third Department's] recitation of the evidence supporting petitioner's conviction was comprised almost entirely of the evidence related to the April 2017 incident, but petitioner was acquitted of that count . . . Moreover, in determining that the evidence of forcible compulsion was met, the [Appellate Division] relied heavily on the victim's testimony regarding the April incident – that petitioner used his body weight to hold her down and that he ignored her screams and pleas to stop . . . This evidence was entirely absent from the victim's testimony related to the [September/October rape] incident, for which petitioner was convicted.

Dkt. No. 7-1 at 23-34.  Therefore, petitioner meets the Section 2254(d)(2) standard because the Appellate Division misstated the material facts it relied upon in affirming his conviction. However, despite petitioner's assertions, Petitioner still must demonstrate that his constitutional rights were violated, and this Court will apply a *de novo* standard of review with no deference to the state court's decision on this issue.  *See Austin v. Plumley*, 565 F. App'x 175, 184-85 (4th Cir. 2014) (holding that when a state court's "decision was based on an unreasonable determination of the facts," AEDPA deference should not apply and the claim

should instead be evaluated "under a purely de novo standard, owing no deference to the State . . . Court's decision."); *see also id.* ("Although neither the Supreme Court nor this court has yet to consider the issue, the weight of the authority establishes that we should . . . decline to apply AEDPA deference when a petitioner satisfies § 2254(d)(2).") (citing the Sixth, Ninth, Tenth, and Eleventh Circuits); *Gabaree v. Steele,* 792 F.3d 991, (8th Cir. 2015) ("Because the state court's conclusions rely on this unreasonable determination of the facts, § 2254(d) does not require that we adhere to that court's decision on this issue, and our review is de novo.") (citing the Sixth, Ninth, and Eleventh Circuits).

### 2.    Merits

Evidence is sufficient to support a conviction when, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Parker v. Matthews*, 567 U.S. 37, 43 (2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  This inquiry "does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit." *Herrera v. Collins*, 506 U.S. 390, 402 (1993) (emphasis in original).  The reviewing court is required to consider the evidence in the light most favorable to the prosecution and draw all inferences in its favor.  *Jackson*, 443 U.S. at 319.

The Supreme Court has explained that its decision in *Jackson* "unambiguously instructs that a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Cavazos v. Smith*, 565 U.S. 1, 7 (2011) (quoting *Jackson*, 443 U.S. at 326). As a

result, "[a] habeas court will not grant relief on a sufficiency claim unless the record is 'so totally devoid of evidentiary support that a due process issue is raised.'" *Carillo v. Superintendent of Green Have Correctional Facility,* 2024 WL 367962 (E.D.N.Y. Aug. 2, 2024) (quoting *Sanford v. Burge,* 334 F. Supp. 2d 289, 303 (E.D.N.Y. 2004) (quoting *Bossett v. Walker,* 41 F.3d 825, 830 (2d Cir. 1994)).

"When considering the sufficiency of the evidence of a state conviction, a federal court must look to state law to determine the elements of the crime." *Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002). To establish petitioner's guilt of first degree rape, the jury had to find beyond a reasonable doubt that petitioner engaged in sexual intercourse with the victim by forcible compulsion. N.Y. PENAL LAW § 130.35. As relevant here, forcible compulsion means to compel by the use of physical force. *Id.* § 130.00(8)(a); T. 616. When deciding the sufficiency of the evidence for forcible compulsion, the Third Department has been "mindful that the forcible compulsion calculus must . . . take into consideration the . . . age of the victim, her relative size and strength compared to the adult defendant, defendant's close relationship to the victim and position of trust and authority within the victim's family and the victim's state of mind, including her expressed fear of telling her father about the incidents given his then close relationship with defendant." *People v. Hartle*, 159 A.D.3d 1149, 1152 (3rd Dep't 2018) (citing cases). In addition, "forcible compulsion is not synonymous with violence . . . and for a sex offense to be predicated upon forcible compulsion neither physical injury nor screaming or crying out is required." *Id.* (internal quotation marks and citations omitted).

Here, drawing every reasonable inference in the prosecution's favor, the record establishes that a rational trier of fact could find evidence sufficient to satisfy forcible compulsion by physical force.

First, there was a large difference in the ages of the minor victim and petitioner. In fact, petitioner was 38 years older than the victim, who was 16.

Second, petitioner was obviously stronger than the victim, and petitioner used that strength during the October incident. The victim testified that petitioner came into the kitchen where she was washing dishes, picked her up from behind, brought her into the bedroom, and pulled down her pants before inserting his penis into her vagina. T. 309, 316, 330-31, 418. This sequence of events – picking the victim up from behind while she was washing dishes, taking her to the bedroom, pulling down her pants, and then penetrating her—gave the jury a basis to infer that petitioner used his strength during the incident in a way that was plainly forceful. In addition, the victim testified that petitioner "raped me again." T. 315. This provided the jury insight into how the victim experienced the October incident.

Third, there was a close relationship between petitioner and the victim. Indeed, petitioner was the victim's stepfather who had a position of trust in the family.

Fourth, petitioner exercised authority both over the house and the victim. Regarding the house, petitioner owned the farm where the victim and her mother lived, and they had lived there with petitioner since the victim was 12. T. 309-10, 386, 482. Regarding the victim, petitioner directed her to do household chores, got involved in disciplining the victim, made rules, and removed privileges when he felt the victim was disobedient. T. 489-90, 491-95. In addition, the victim often found herself alone at petitioner's home while her mother was at work. T. 311. *See People v. Sehn*, 295 A.D.2d 749, 750-51 (3rd Dep't 2002) (finding

forcible compulsion where a 10- and 12-year-old girl were victims to a man they considered their "uncle" due to "the age of the victims, [the abuser's] extreme advantage in maturity, size and strength, the fact that the victims were isolated . . . in an apartment with [the abuser] and considered him to be an authority figure whom they obeyed [and] trusted.").

Fifth, a reasonable juror could rely on the victim's testimony that she experienced persistent and escalating abuse to illuminate her state of mind.  Specifically, she testified that petitioner started by touching her vagina multiple times a week while her mother was at work, and when she confronted him about stopping, he told her that "it was a learning experience" for her.   T. 310-11.  After that, it got worse, and petitioner began "orally abusing" her and putting his mouth on her vagina, and eventually petitioner subjected her to vaginal intercourse.[8]   T. 312.   As the licensed clinical social worker explained, a reasonable juror could infer that these experiences would make the victim feel powerless and helpless and also cause her to stop attempting to resist.  *See Hartle*, 159 A.D.3d at 1151-52 (finding forcible compulsion where a 15-year-old victim described four incidents of sexual offenses by her father's best friend, where she attempted to resist during the first two incidents and, by the fourth, ceased all resistance because she knew that the perpetrator would not stop).

---

[8] Respondent argues that that the jury could consider the victim's testimony regarding the April incident to understand the relationship between petitioner and the victim and as context for the September/October rape even though the jury acquitted on the April rape counts and convicted on the April child endangerment count.  Dkt. No. 7-1 at 27.  Specifically, respondent asserts that evidence that petitioner pinned down the victim using his body weight and ignored her pleas and screams for him to stop demonstrated that the victim did not consent and that "any lack of physical resistance on the victim's part was due to her experience that such resistance would be futile."  *Id.*  Given that there is sufficient evidence of forcible compulsion without these details, the Court need not decide how, if at all, the jury's acquittal on the April rape counts and conviction on the April child endangerment count affects the relevance of those details here. If, however, they were considered, then the evidence of forcible compulsion would be even stronger given the additional context of escalating sexual abuse.

Sixth, a reasonable juror could conclude that the victim's failure to disclose petitioner's abuse made sense given her attachment disorder which caused her to keep her feelings and emotions to herself, T. 389-90, and the testimony of the licensed clinical social worker specializing in working with child abuse victims that disclosure is a process that is commonly both delayed and inconsistent.  T. 438-39.  In addition, the victim testified that petitioner told her "that it wasn't wise for me to tell anybody, that people would think badly of me."   T. 317.

Petitioner's assertions in his Reply that forcible compulsion requires brute physical force, resulting injury, screaming, resistance, or some other sort of violence is contrary to well-established law.  *See Hartle*, 159 A.D.3d at 1152 (concluding that there was sufficient evidence of forcible compulsion and that "conclusion is buttressed by the principles that 'forcible compulsion is not synonymous with violence,' and 'for a sex offense to be predicated on forcible compulsion neither physical injury nor screaming or crying out is required'") (quoting *People v. Peranza*, 288 A.D.2d 689, 691 (3rd Dep't 2001), *leave denied* 97 N.Y.2d 707 (2002) and *People v. Scanlon*, 52 A.D.3d 1035, 1038 (3rd Dep't 2008) (additional quotations and citations omitted)).

In sum, despite the Appellate Division's error of using the wrong facts to support its decision affirming petitioner's conviction, review of the correct facts establishes that there is sufficient evidence for a rational trier of fact to find petitioner guilt beyond a reasonable doubt for the September/October rape.  Therefore, petitioner has failed to meet his burden to show that his constitutional rights were violated.

### C.    Defects in the Grand Jury Proceeding

Petitioner argues that the state court erred in denying his 330 motion to dismiss the indictment.  Pet. at 10, 20.  Specifically, petitioner contends that there are defects in both the

26

grand jury proceedings and the court's review of those proceedings that make the indictment deficient, as it was supported by legally insufficient evidence, and in violation of petitioner's due process rights. *Id.* at 20.

Respondent argues that any such claim is not cognizable on federal habeas review. Dkt. No. 7-1 at 30-31. Petitioner disagrees, arguing that "[a]ny granted right pursuant to the New York State Constitution[] . .. would automatically be a fundamental fourteen[th] amendment violation pursuant to the due process clause of the United States Constitution." Reply at 11.

Petitioner is mistaken. Courts in this district have consistently held that a "petitioner's challenge of [a] grand jury proceeding is not cognizable in a habeas corpus proceeding in federal court." *Shepard v. Rich*, No. 9:23-CV-0897 (TJM/MJK), 2024 WL 5358399, at *9 (N.D.N.Y. Sept. 12, 2024) (citing *Davis v. Mantello*, 42 F. App'x 488, 490 (2d Cir. 2002) ("Claims of deficiencies in state grand jury proceedings are not cognizable in a habeas corpus proceeding in federal court.") (citing cases); *see also Hirsh v. McArdle*, 74 F. Supp. 3d 525, 533 (N.D.N.Y. 2015) (same) (citing cases). This is because while "[i]n New York, a grand jury indictment arises from the State Constitution and other state laws . . . federal habeas relief may not be granted for violations of state law," and "[t]here is no [separate] federal constitutional right to a grand jury proceeding in a state criminal proceeding." *Shepard*, 2024 WL 5358399, at *9 (citations omitted).

Furthermore, "[f]or federal constitutional purposes, a jury conviction transforms any defect in the grand jury's charging decision into harmless error because the trial conviction establishes probable cause to indict and also proof of guilty beyond a reasonable doubt." *Byng v. Annucci*, No. 9:18-CV-0994 (JKS), 2021 WL 1565189, at *8 (N.D.N.Y. Apr. 21, 2021)

27

(citing *United States v. Mechanik*, 475 U.S. 66, 70 (1986) (holding that a jury's guilty verdict renders "any error in the grand jury proceeding connected with the charging decision . . . harmless beyond a reasonable doubt."); *see also Lopez v. Riley*, 865 F.2d 30, 32 (2d Cir. 1989) (applying *Mechanik* to conclude that "claims concerning a state grand jury proceeding are *a fortiori* foreclosed in a collateral attack brough in a federal court.").

### D.    Exceeding The Scope of Trial Court's *Molineaux* Ruling

Petitioner argues, as he did on direct appeal, that the trial court improperly permitted the prosecutor to introduce evidence that petitioner had committed uncharged crimes, specifically sexually assaulting the victim by touching her vagina on multiple occasions.  Pet. at 18.  Further, petitioner argues that the prosecution exceeded the scope of the evidentiary ruling by submitting prejudicial evidence that petitioner had performed oral sex on the victim. *Id.* at 19.

Respondent contends that these claims are procedurally barred by an adequate and independent state law ground, not cognizable on federal habeas review, and meritless.  Dkt. No. 7-1 at 28-35.  Petitioner disagrees, asserting that his claim represents "a fundamental fourteenth amendment violation for the state courts failure to follow its own precedent," because, petitioner argues, this case is "distinguishable and inconsistent" from "cases where background evidence that included uncharged crimes was admitted."  Reply at 14.

### 1.    Independent and Adequate State Law Ground

Petitioner fails to address respondent's argument that, given the Appellate Division's holding that petitioner failed to properly object and preserve his challenge, his claims related to the trial court's *Molineaux* ruling are procedurally barred.  For the following reasons the Court finds that petitioner's *Molineaux* claims are procedurally barred.

"A federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment," *Walker v. Martin*, 562 U.S. 307, 315 (2011) (internal quotation marks, alterations, and citations omitted), "unless the prisoner can demonstrate cause for the default and actual prejudice . . . or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice," *Coleman v. Thompson*, 510 U.S. 722, 750 (1991).

The Second Circuit has held that New York's contemporaneous objection/preservation rule "is a state law ground . . . independent of any federal question . . . ." *Garvey v. Duncan*, 485 F.3d 709, 720 (2d Cir. 2007).  Therefore, the state court's application of the contemporaneous objection/preservation rule was independent of the federal question of whether the trial court's *Molineaux* ruling deprived petitioner of a fair trial.  Further, the Second Circuit has also repeatedly held "that the contemporaneous objection[/preservation] rule is firmly established and regularly followed New York procedural rule."  *See, e.g., Downs v. Lape*, 657 F.3d 97, 104 (2d Cir. 2011).  Consequently, here "the Appellate Division's denial of Petitioner's claim concerning [a] . . . County Court's *Molineaux* ruling based on his failure to properly preserve it, as required by New York law, constitutes an independent and adequate state law ground precluding federal habeas review."  *Burton v. Wolcott*, No. 9:21-CV-0736 (DNH/TWD), 2024 WL 3184658, at *18 (N.D.N.Y. May 29, 2024).  Therefore, petitioner's claims are unreviewable unless he can show cause for the default and either actual prejudice or a fundamental miscarriage of justice.

To establish cause, petitioner must show that some objective external factor impeded his ability to comply with the relevant procedural rule.  *Maples v. Thomas*, 565 U.S. 266, 280

(2012); *Coleman*, 501 U.S. at 753.  If a petitioner fails to establish cause, a court need not decide whether he suffered actual prejudice, because federal habeas relief is generally unavailable as to procedurally defaulted claims unless both cause and prejudice are demonstrated.  *See Murray v. Carrier*, 477 U.S. 478, 496 (1986) (referring to the "cause-and-prejudice standard"); *Stepney v. Lopes*, 760 F.2d 40, 45 (2d Cir. 1985).

Here, the petition fails to identify any cause for petitioner's default, and he does not argue that he is actually innocent.  Thus, there is nothing that can save petitioner's procedurally defaulted claim, and habeas relief is precluded.

### 2.    Cognizability of Evidentiary Challenge

Further, despite petitioner's conclusory and unsupported assertions in his reply, his challenge to the trial court's evidentiary ruling is misplaced.

First, "[t]o the extent the Petitioner challenges the admission of testimony regarding uncharged 'bad acts' under a New York state evidentiary rule, this argument does not implicate clearly established federal law and thus, is not cognizable on federal habeas review."  *Arena v. Kaplan*, 952 F. Supp. 2d 468, 483 (E.D.N.Y. 2013).  "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *see also Roberts v. Scully*, 875 F. Supp. 182, 189 (S.D.N.Y. 1995) ("In general, rulings by the state trial court on evidentiary questions are a matter of state law and pose no constitutional issue.") (citing *Estelle* and other Supreme Court cases holding the same).

Second, "the Supreme Court has expressly declined to decide whether admitting evidence of uncharged crimes violates a [petitioner's] due process rights . . . and consequently there is no clearly established Federal law as determined by the Supreme

Courts of the United States." *Arena*, 952 F. Supp. 2d at 483 (internal quotation marks, alterations, and citations omitted); *see also Vargas v. Walsh*, No. 1:10-CV-7604, 2011 WL 1900115, at *5 (S.D.N.Y. Apr. 14, 2011) ("As has been repeatedly recognized in case law, the Supreme Court has never taken an unambiguous position on whether the admission of prior bad acts evidence in state court – even when introduced to show criminal propensity – violates due process.") (internal quotation marks, alterations, and citations omitted).  In sum, "[c]ourts have routinely held that federal habeas corpus relief is unavailable to challenge the admission of propensity or 'prior bad acts' evidence because there is no clearly established Supreme Court law barring the practice."  *Vargas*, 2011 WL 1900115, at *5 (citing cases).

Accordingly, for these reasons, the claims fail.[9]

### E.    Ineffective Assistance of Counsel

#### 1.    Trial Counsel

Petitioner claims that his trial counsel was constitutionally ineffective for (1) failing to inform petitioner of the exact date of the alleged September/October rape so that an alibi defense could have been explored and utilized, and (2) "a number of other violations pursuant to counsel's action during the pre-trial and trial."  Pet. at 23.  Respondent contends that the Schoharie County Court reasonably applied clearly established Supreme Court law in denying this claim in petitioner's 440 motion.  Dkt. No. 7-1 at 38-42.  In his Reply, petitioner does not further expand upon his claims about discovering an exact date for the alleged crime and its consequence on his ability to assert an alibi defense; however, he appears to refute the respondent's vagueness argument by introducing an argument that his attorney actively concealed the CARRT Center Interview.  Reply at 15.  Having a transcript of this

---

[9]  The Court does not address respondent's alternative merits argument because petitioner's *Molineaux* claims are both procedurally defaulted and not cognizable.

videotaped interview, petitioner alleges, would prove his claims of ineffective assistance. Reply at 15-16.

To establish that counsel was constitutionally ineffective, a petitioner must demonstrate (1) "that counsel's performance was deficient" and (2) "that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To prove deficiency, "a person . . . must show that 'counsel's representation fell below an objective standard of reasonableness.'" *Harrington v. Richter*, 562 U.S. 86, 104 (2010) (quoting *Strickland*, 466 U.S. at 688). Under the second prong, "a [petitioner] must 'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Lafler v. Cooper*, 566 U.S. 156, 163 (2012) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. An ineffective assistance of counsel claim must be denied if the petitioner fails to make a sufficient showing under either of the *Strickland* prongs. *See Strickland*, 466 U.S. at 697 (explaining courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

"Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Harrington*, 562 U.S. at 105. When evaluating an ineffective assistance claim on habeas review, "the question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect[,] but whether that determination was unreasonable – a substantially higher threshold." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro*, 550 U.S. at 473) (internal quotations omitted). Therefore, "[w]hen § 2254(d) applies, the question is not

whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard."  *Harrington*, 562 U.S. at 105.

Petitioner's claim that his trial attorney was ineffective for failing to inform him of the specific day of the September/October rape is meritless because there is no evidence that information was available to anyone, let alone petitioner's attorney.  In addition, the county court judge denied this specific argument during petitioner's 440 motion when he found Gaylord's testimony credible, and his conclusion was not unreasonable.  Gaylord explained how he tried to get a more specific date by requesting a Bill of Particulars and then questioning the various witnesses, including the victim, to try and narrow the possible date range by ascertaining the time of day or day of the week.  Even though none of these strategies were completely fruitful, it does not mean that counsel's assistance was ineffective.

Further, given that petitioner had to defend against a date range instead of a specific date, counsel explained why an alibi defense was not available.  The unavailability of the defense was not because of a lack of reasonable diligence on counsel's part.  Instead, as counsel noted, petitioner never indicated that he had an alibi.  The best information petitioner provided was that the victim spent one weekend, during the date range, out of town with her grandmother,  but the victim testified that the rape occurred in the afternoon, after she arrived home from school, so having an alibi during the weekend could not help counsel defend against the pending criminal charges.

Moreover, although petitioner testified that his wife, the victim's mother, always knew where he and the victim were, that testimony alone does not actually prove that she would be able to provide an alibi.  Knowing an individual's general whereabouts based on their habits

and representations are insufficient to establish the true, exact whereabouts of an individual throughout a two-week period.  Further, eliciting further testimony from the victim's mother about petitioner's whereabouts may have been unhelpful because, as it stood, the victim's mother corroborated the setting of the victim's story that both the victim and petitioner were often home alone together in the afternoons after the victim returned home from school and before her mother returned home from work.

Because establishing an alibi was impossible, Gaylord testified that his strategy was to challenge the victim's credibility based on her inability to specify the date such a traumatic event occurred.  The 440 court noted that this strategy was a reasonable one, as it resulted in petitioner being acquitted of two of the counts in the indictment.

In sum, petitioner cannot prove that his counsel was constitutionally ineffective for failing to secure information where no one had access to that information.  Further, because an alibi defense requires an attorney to know the specific date and time of the alleged criminal activity, Gaylord's decision not to pursue that path was reasonable because he could not determine when he needed to find an alibi.  *See Vasquez v. New York,* No 1:17-CV-0697, 2020 WL 2859007, at *11 (S.D.N.Y. Feb. 27, 2020) (alternatively denying petitioner's ineffective assistance claims because "he does not identify any actions that [his] counsel failed to take.").   Finally, Gaylord's decision to use the victim's inability to pinpoint a specific date range as a tactic to undermine her credibility was, in part, successful.  Petitioner's retrospective disagreement with the strategy, or the fact that ultimately it was not completely effective does not render counsel's efforts constitutionally deficient.  *See Lalonde v. Thomas*, No. 9:20-CV-1561 (GTS), 2022 WL 1303918, at *19 (N.D.N.Y. May 2, 2022) ("While a petitioner may disagree with trial counsel's strategy, counsel is not ineffective merely because

34

a strategy he/she employed was unsuccessful.") (collecting cases); *Backus v. Nichols*, No. 9:04-CV-0356 (TJM/GHL), 2008 WL 413295, at *12 (N.D.N.Y. Feb. 13, 2008) ("[t]o the extent [the petitioner]'s claim suggests a disagreement with counsel's strategy, '[a] petitioner cannot prevail on a claim of ineffective assistance merely because he disagrees with his counsel's strategy.'") (quoting *Bussey v. Greiner*, No. 1:02-CV-8642, 2007 WL 2589454, at *8 (S.D.N.Y. Aug. 28, 2007)) (additional citation omitted).

Furthermore, petitioner's claims that Gaylord failed to take numerous actions at the pre-trial and trial stage—supported only by allegations that further details of those omissions would be located in the CARRT Center Interview recording—is wholly insufficient to support a claim of ineffective assistance.  *See DeLee v. Graham*, No. 9:11-CV-0653 (MAD/CFH), 2013 WL 3049109, at *23 (N.D.N.Y. June 17, 2013) (concluding that petitioner's failure to "allege why such motions would have been arguably meritorious" and demonstrate how "the verdict would have been different if such motions were filed" is fatal to his claim).  The Court agrees that petitioner's allegations rely on vague and conclusory arguments which cannot support a constitutional claim.  *See Scott v. Racette*, No. 1:15-CV-0043, 2018 WL 451825, at *7 (W.D.N.Y. Jan. 17, 2018) (collecting cases).

Because petitioner has failed to demonstrate that his counsel's performance was deficient, it is not necessary to address whether petitioner suffered prejudice.  *See Strickland*, 466 U.S. at 697.  Accordingly, petitioner's claims of ineffective assistance for his trial counsel must be denied.

## 2.    Appellate Counsel

Petitioner also claims that he was denied effective assistance of appellate counsel because his counsel failed to argue the claim that the trial evidence was legally insufficient.

Pet. at 21.  Petitioner's pleading refers to his coram nobis motion, which specifically sought

relief because his appellate counsel failed to (1) cite to Supreme Court precedent to support

his legal insufficiency claim on direct appeal; (2) file a reply brief to the People's opposition;

and (3) argue that petitioner's sentence was harsh and excessive.

Respondent argues that the state court reasonably denied petitioner's claim.  Dkt. No.

7-1 at 44-48.

Petitioner's reply focuses solely on Gaylord's decision not to file a reply brief during his

direct appeal.  Specifically, petitioner asserts that Gaylord's failure to file a reply brief to alert

the appellate court "that the people's opposition brief contained a total false factual predicate

and was based upon all of the information pursuant to the incident that petitioner was

acquitted of and could *not* be legally used to support his conviction," was "so far outside of

the professional normal that it amounted to having no counsel at [all] at this critical stage of

the proceedings."  Reply at 17.  This "objectively unreasonable [action] . . . resulted in

petitioner being prejudiced by having his conviction affirmed upon a set of false facts."  Reply

at 18.

The *Strickland* test applies to claims of ineffective assistance of appellate counsel.

*Smith v. Robbins*, 528 U.S. 259, 285-86 (2000); *Smith v. Murray*, 477 U.S. 527, 535-36

(1986); *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994).  To prevail, a petitioner must

demonstrate that (1) "his counsel was objectively unreasonable in failing to find arguable

issues on appeal" and (2) "a reasonable probability that, but for his counsel's unreasonable

failure to" raise an issue on appeal, "he would have prevailed on his appeal."  *Smith*, 528

U.S. at 259 (citation omitted).

To establish the first prong, petitioner must show "that counsel unreasonably failed to

discover nonfrivolous issues and to file a merits brief raising them."  *Smith*, 528 U.S. at 285;

*see also Mayo*, 13 F.3d at 533 ("a petitioner may establish a constitutionally inadequate

performance if he shows that [appellate] counsel omitted significant and obvious issues while

pursuing issues that were clearly and significantly weaker.") (citing *Gray v. Greer*, 800 F.2d

644, 646 (7th Cir.1985); *Fagan v. Washington*, 942 F.2d 1155, 1157 (7th Cir.1991) ("His

lawyer failed to raise either claim, instead raising weaker claims.... No tactical reason-no

reason other than oversight or incompetence-has been or can be assigned for the lawyer's

failure to raise the only substantial claims that [defendant] had."); *Matire v. Wainwright*, 811

F.2d 1430, 1438 (11th Cir.1987) (ineffective assistance of counsel when appellate counsel

ignored "a substantial, meritorious Fifth Amendment issue" raising instead a "weak issue")).

 To establish the second, "a petitioner must demonstrate that there was a reasonable

probability that his claim would have been successful before the state's highest court."  *Mayo*,

13 F3d at 534 (internal quotation marks, alterations and citations omitted).  "A petitioner must

show more than counsel's failure to raise a non-frivolous argument, because counsel is

required to use professional judgment when deciding to concentrate on a few key issues

while eliminating weaker arguments, and is not required to advance every argument urged by

the petitioner."  *Hines v. Stallone*, 9:16-CV-1078 (TJM), 2017 WL 445387, at *9 (N.D.N.Y.

Feb. 1, 2017) (citing *Evitts v. Lucey*, 469 U.S. 387, 394 (1985), and *Jones v. Barnes*, 463

U.S. 745, 751-52 (1983)).

 Petitioner's first claim fails because he cannot prove the second prong.  Regardless of

Gaylord's failure to expressly cite federal case law in his brief—given that Gaylord generally

challenged "a lack of legally sufficient evidence of forcible compulsion" in his Third

Department submissions, SCR at 2, 20, and stated that petitioner was appealing the

"intermediate appellate court's finding of legally sufficient evidence," to support his September/October rape conviction in his leave application to the Court of Appeals— petitioner has failed to demonstrate a reasonable probability that including citations to federal law would have led to a different outcome before the Court of Appeals.  The Third Department's opinion recognized that petitioner was asking for review of the legal sufficiency of the evidence supporting his conviction.  *Schinnerer*, 192 A.D.3d at 1395 (stating that petitioner "argue[d] that the verdict as to his conviction for rape in the first degree is not supported by legally sufficient evidence as to the element of forcible compulsion," and evaluating that legal claim).  Further, the legal sufficiency claim was the only one that was raised before the Court of Appeals.  Accordingly, both the Third Department and the Court of Appeals evaluated the legal insufficiency claim.  There is no indication that petitioner's appeals would have been successful if, instead, his counsel had included a federal case citation.  In sum, petitioner's conclusory claims that relying on federal precedent would have made petitioner's arguments more persuasive, meritorious, or successful and would have ultimately changed petitioner's outcome are not convincing.

Petitioner's second claim, that Gaylord's failure to file a reply brief to correct the Third Department's reliance on the wrong set of factual circumstances to uphold the challenged conviction, is also insufficient to establish constitutionally ineffective counsel.  Although filing a reply brief to preemptively clarify any potential confusion about the proper facts may have been helpful, counsel's failure to file a reply did not render his representation ineffective because counsel's main brief outlined the proper fact pattern underlying the challenged conviction, and the Third Department had the trial transcript and record.  *See Heroin v. Phillips*, No. 1:04-CV-5465, 2008 WL 820746, at *28 (E.D.N.Y. Mar. 26, 2008) (finding that

failure to file a reply brief did not constitute ineffective assistance of appellate counsel where the main brief presented a persuasive and complete argument and anticipatorily addressed, without delving into great detail, one of the opposition's arguments).  Further, petitioner has not shown that the outcome of his appeal would have been different had such a supplemental pleading been filed.  For the reasons previously discussed, even if Gaylord had taken steps to correct the state court's incorrect recitation of the facts, there was still legally sufficient evidence to support his conviction.

Petitioner's final claim—that counsel's failure to seek a sentence reduction represented ineffective representation—is also unpersuasive.  Petitioner provides nothing but anecdotal evidence that a sentence reduction may be possible.  SCR at 222 (arguing that his sentence should have been decreased because he "had no real criminal history and some serial rapists do not receive such a sentence.").  There is no reason to believe that petitioner would be able to persuade the state court to lessen his sentence.  The determinate sentence range for first-degree rape was 5 to 25 years, New York Penal Law §§ 70.02(3)(a) & 130.35, and the post-release supervision range was 5 to 20 years, *id.* § 70.45(2-a)(c).  Petitioner's sentence of 8 years, plus 20 years supervision was within the determinate sentence range.  Further, although petitioner had no prior criminal history, other factors, like the victim's testimony about petitioner's increasing and persistent sexual abuse over years, also weighed into his sentencing decision.  Accordingly, petitioner's assertions that his sentence would have been different had Gaylord presented that challenge to the highest state court are not persuasive.

### F.    Prosecutorial Misconduct

Finally, petitioner argues that he was denied a fair trial because of prosecutorial

misconduct.  Pet. at 22.  Specifically, petitioner argues that the prosecutor knowingly

concealed the exact day that the September/October rape occurred.  Pet. at 22.

Respondent argues that petitioner's claims are meritless because petitioner is unable

to satisfy the elements of a *Brady* violation, and the state court did not unreasonably apply

clearly established Supreme Court law when it denied petitioner's 440 motion.  Dkt. No. 7-1

at 43-44.

Petitioner contends that he cannot completely reply to the opposition "without a

complete copy of counsel's case file which contains the 'CARRT CENTER INTERVIEW[.]'"

Reply at 19.  Petitioner clarifies that the interview would illuminate perjured statements and

correct falsehoods because in the interview "the [victim] never states that she was held down

during this alleged incident, including [sic] refusing a medical exam, as it would have shown

that her hyman was still intact, with other inconsistencies proving . . . that the prevarication

ran deep with coercion from one testimony to the next[.]"  Reply at 19.

This Court has previously explained that a petitioner's due process rights can be

violated by a prosecutor's failure to produce evidence.

> Prosecutors must disclose to an accused exculpatory
> information in their possession that is favorable to the defense
> and material to guilt or punishment, *Brady [v. Maryland]*, 373
> U.S. [83,] 87 [[(1963), and evidence affecting the credibility of a
> witness, where the reliability of the witness could determine guilt
> or innocence, *Giglio v. United States*, 405 U.S. 150, 154 (1972).

*Major v. Lamanna*, No. 9:18-CV-0418 (DNH/TWD), 2021 WL 4267851, at *18 (N.D.N.Y. Sept.

3, 2021), *adopting Report and Recommendation*, 2022 WL 408819 (N.D.N.Y. Feb. 10, 2022).

 However, not every failure to disclose information constitutes a constitutional violation.  *See*

*Strickler v. Greene*, 527 U.S. 263, 281 (1999).

"To establish a *Brady* violation, a [petitioner] must show (1) that the evidence at issue is favorable to [him], either because it is exculpatory, or because it is impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued." *United States v. Paulino*, 445 F.3d 211, 224 (2d Cir. 2006) (citing *Strickler*, 527 U.S. at 281-82) (internal quotation marks omitted). *Brady* is not violated "unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler*, 527 U.S. at 281.

A petitioner bears the burden of proving that the prosecution withheld material information. *Harris v. United States*, 9 F. Supp. 2d 246, 275 (S.D.N.Y. 1998). "Conclusory allegations that the government 'suppressed' or 'concealed' evidence do not entitle [the petitioner] to relief." *Id.* (quotations omitted); *see also Mallet v. Miller*, 432 F. Supp. 2d 366, 378 (S.D.N.Y. 2006) (*Brady* claim dismissed where supported only by conjecture); *Flynn v. Colvin*, No. 9:13-CV-1247 (JKS), 2016 WL 7053582, at *6 (N.D.N.Y. Dec. 5, 2016) ("It is well-settled in this Circuit that vague and conclusory allegations that are unsupported by specific factual averments are insufficient to state a viable claim for habeas relief.") (citation omitted).

Here, petitioner cannot show that the People withheld any information from the defense. Petitioner has failed to establish where information exists that would give a specific date for the September/October rape, he instead surmises that it would be in the CARRT Center Interview recording, but petitioner's conclusory assertions are insufficient to satisfy the standard and contradicted by the record. *See Chrysler v. Guiney*, 14 F. Supp. 3d 418, 450 (S.D.N.Y. 2014) ("Conclusory or speculative allegations that the Government failed to disclose evidence are insufficient to support a *Brady* violation."). The testimony from the victim consistently demonstrated that she was unsure of the exact date of the incident. She

was only clear that it happened sometime in the afternoon, while her mother was still at work, during the time period alleged in the Indictment and Bill of Particulars.  Further, petitioner's contrary assertions reflect a misunderstanding of his burden.  *See Harris*, 9 Supp.2d at 275 ("the government does not bear the burden of establishing the documents were *not* withheld; it is [the petitioner's] burden to prove that the government failed to disclose evidence favorable to [him].").  In sum, because petitioner cannot establish that the People withheld information about a more specific date for the September/October rape, his *Brady* claim is denied.

## V.    MOTION TO EXPAND THE RECORD

Petitioner also moved to expand the state court record to include two grievance packets which petitioner filed about his trial and appellate counsel, Mark Gaylord.  Dkt. No. 16.  The grievances relate to disclosure of petitioner's case file, specifically video of the victim's taped interview at the CARRT Center immediately after her disclosure to her guidance counselor.[10]  *Id.* at 3-11.

Specifically, in the first grievance, petitioner contends that there is information within the taped interview that would have been helpful to his case: (1) the victim refusing to get a medical exam and therefore having no physical proof of any bruising or trauma to her genital area; (2) the victim's changing description of petitioner's genital area; and (3) the inconsistency between the number of times the victim contends she was raped during the interview versus the charges against petitioner.  Dkt. No. 16 at 4-5.  Petitioner contends that the abundance of inconsistencies in the taped interview would have helped him impeach the

---

[10]   During petitioner's criminal court proceeding, his counsel indicated that "[n]o transcript was ever made of the [videotaped] interview," but that the videotape itself could be, and was, used to refresh the victim's recollection during his cross-examination of her.  T. 282-85; *also see* T. 344-46, 350-51, 372-73 (examples of times during cross-examination when the jury was excused so petitioner could view portions of the taped CARRT interview in the courtroom).

victim, amounting to a *Brady* violation.  *Id.* at 5.  In the second grievance, petitioner argues

that seven minutes of the CARRT Center interview were omitted because he remembers

viewing a portion of the video which was not captured in the transcription.  *Id.* at 8.  Petitioner

also recycled several of his arguments from the preceding grievance.  *Id.* at 9.

Respondent opposes petitioner's motion, arguing that the grievance packets were not

part of the record before the state courts that decided petitioner's state court appeal or post-

conviction matters.  Dkt. No. 18 at 1-2.

In petitioner's reply, he primarily concentrates on the CARRT Center interview video

which, he contends, was concealed during his state court proceedings and intentionally kept

from him for years, until it was recently turned over to him by Gaylord during an Article 78

proceeding.  Dkt. No. 19. at 2-4.  Petitioner concludes that this constitutes *Brady* material,

which he alludes to being exculpatory.  *Id.* at 2, 4.

"A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to

discovery as a matter of ordinary course."  *Bracy v. Gramley*, 520 U.S. 899, 904 (1997).

However, pursuant to Habeas Rules 6 and 7, a district court may order discovery or

expansion of the record where a party demonstrates good cause.  Good cause is

demonstrated where the petitioner advances "specific allegations before the court [to] show

reason to believe that the petitioner may, if the facts are fully developed, be able to

demonstrate that he is entitled to relief . . . ."  *Bracy*, 520 U.S. at 909 (internal quotation

marks omitted).

The Supreme Court has explicitly held

> that review under § 2254(d)(1) is limited to the record that was
> before the state court that adjudicated the claim on the merits.
> Section 2254(d)(1) refers, in the past tense, to a state-court
> adjudication that "resulted in" a decision that was contrary to, or

> "involved" an unreasonable application of, established law. This
> backward-looking language requires an examination of the state-
> court decision at the time it was made. It follows that the record
> under review is limited to the record in existence at that same time
> i.e., the record before the state court.

*Cullen v. Pinholster*, 563 U.S. 170, 181-82 (2011).  The "AEDPA's statutory scheme is

designed to strongly discourage [the submission of new evidence because] . . . federal courts

sitting in habeas are not an alternative forum for trying facts and issues which a prisoner

made insufficient effort to pursue in state proceedings."  *Id.* at 186; *see also Greene v. Fisher*,

565 U.S. 34, 44 (2011) (explaining the rationale behind *Cullen*, namely that "§ 2254(d)(1)

requires federal courts to focus on what a state court knew and did and to measure state-

court decisions against [Supreme Court] precedents as of the time the state court renders its

decision.") (internal quotation marks and emphasis omitted).

Here, respondent is correct.  None of the grievance packets were considered by any of

the state courts during petitioner's direct or state court collateral challenges because they

were both created after the conclusion of petitioner's state court proceedings.  Petitioner's

direct appeal concluded in June of 2021, his coram nobis petition concluded in March of

2022, and his 440 motion concluded in February of 2023.  One of the grievance packets is

dated January 12, 2024, Dkt. No. 16 at 3, while the other is dated December 24, 2023, Dkt.

No. 16 at 8.   Petitioner's motion to expand the record to include the grievance packets is

therefore denied.[11]

---

[11]   Liberally construing petitioner's motion, it appears that he may be seeking to include a transcript of the CARRT Center Interview in the State Court Record, but he has not articulated good cause to support his request.  First, petitioner's "generalized statements about the possible existence of material do[es] not constitute 'good cause.' Rather a petitioner must produce specific evidence that supports his claim that the requested material exists." *Green v. Artuz*, 990 F. Supp. 267, 271 (S.D.N.Y. 1998).  Here, petitioner assumes that there will be further impeachment and exculpatory material in the transcript, but those conclusory assertions are nothing more than conjecture.  *See Naranjo v. United States*, No. 1:16-CV-7386, 2019 WL 4879297, at *1 (S.D.N.Y. Oct. 3, 2019) (explaining that "Rule 6 does not license a petitioner to engage in a fishing expedition seeking documents merely to determine whether the requested items contain any grounds that might

## VI.    CONCLUSION

**WHEREFORE**, it is

**ORDERED** that the petition, Dkt. No. 1, is **DISMISSED AND DENIED**; and it is further

**ORDERED** that petitioner's motion to expand the record, Dkt. No. 16, is **DENIED**; and it is further

**ORDERED** that the Court declines to issue a Certificate of Appealability.  28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003)).  Any further request for a Certificate of Appealability must be addressed to the Court of Appeals.  *See* Fed. R. App. P. 22(b); 2d Cir. R. 22.1.

**ORDERED** that the Clerk serve a copy of this Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED**.

Dated: October 15, 2025

Elizabeth C. Coombe
U.S. District Judge

---

support his petition, and not because the documents actually advance his claims of error.") (internal quotation marks and citations omitted).

Second, several of the examples that petitioner mentions in his grievance were discussed during the trial testimony. *See* T. 370-76 (discussing the victim's testimony about her observations of petitioner's genitalia and using the interview tape to refresh her recollection as to her inconsistent statements during her interview); T. 367 (admitting that she never told anyone about the abuse or went to receive medical treatment after either rape).  Most of that evidence was already presented to the jury, and the jury chose not to believe petitioner.  Accordingly, petitioner has failed to establish good cause because there is no reason to believe that the addition of the transcript would entitle petitioner to relief.